1  WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ronald Arthur Holliday, | No. CV-16-08203-PCT-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Ronald Arthur Holliday's appeal of the Social Security Administration's decision to deny benefits. (Doc. 1.) For the reasons set forth below, the Court affirms the decision.

**BACKGROUND**

On November 27, 2012, Ronald Arthur Holliday applied for disability insurance benefits and supplemental security income, alleging a disability onset date of January 1, 2010. (Tr. 21.) Holliday's claim was denied on July 5, 2013. (Tr. 79–96.) He then appealed to an Administrative Law Judge ("ALJ"). (Tr. 21.) A hearing was initially held on July 1, 2014, but postponed until November 4, 2014, so that Holliday could obtain counsel. (Tr. 39–76.)

In evaluating whether Holliday was disabled, the ALJ undertook the five-step sequential evaluation for determining disability.[1] At step one, the ALJ determined that

---

[1] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing

Holliday had not engaged in substantial gainful activity since his alleged onset date. (Tr. 23.) At step two, the ALJ determined that Holliday suffered from severe impairments of "(1) Hypertension; (2) Status post cerebral vascular accident (CVA) and transient ischemic attacks (TIAs); (3) Cardiomyopathy; (4) Seizure disorder; and (5) Degenerative disc disease of the lumbar spine." (*Id.*) At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the Social Security Administration's listed impairments. (Tr. 24.)

The ALJ then made the following determination of Holliday's residual functional capacity ("RFC"):[2]

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can occasionally bend, squat, and kneel; cannot climb ladders or scaffolds; cannot work in hazardous work areas; cannot work in temperature extremes; and cannot perform complex tasks, such that he is limited to work with a svp of 2 or less.

(Tr. 25.) At step four, the ALJ found that the "demands of the claimant's past relevant work exceed the residual functional capacity." (Tr. 28–29.) The ALJ therefore

---

supplemental security income). Under the test:

> A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations. If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, . . . she is not able to perform any work that she has done in the past. Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy. This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal citations and quotations omitted).

[2] RFC is the most a claimant can do despite the limitations caused by his impairments. *See* S.S.R. 96-8p, 1996 WL 374184 (July 2, 1996).

- 2 -

proceeded to step five.

The ALJ began his step five analysis by noting that "[p]rior to the established disability onset date, the claimant was a younger individual age 18–49 [but on] November 21, 2013, the claimant's age category changed to an individual of advanced age." (Tr. 29.) Accordingly, the ALJ determined that prior to November 21, 2013, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed," but that there were no such jobs after that point.[3] (Tr. 29–30.) The ALJ therefore determined that Holliday was not disabled through December 31, 2012—the date last insured—and was therefore ineligible for disability benefits, but that he was eligible for supplemental security income. (Tr. 31.)

Holliday appealed to the Appeals Council. (Tr. 15.) The Appeals Council declined to review the ALJ's decision on disability benefits, (Tr. 2–5), and reversed the ALJ's decision on supplemental security income, (Tr. 6–12).[4] Holliday filed the complaint underlying this action on September 12, 2016, seeking this Court's review of the Social Security Administration's denial of benefits. (Doc. 1.)

## DISCUSSION

### I. Standard of Review

A reviewing federal court need only address the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant

---

[3] This was so because the Medical-Vocational Guidelines treat younger individuals and individuals of advanced age differently when it comes to the transferability of job skills. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[4] The Appeals Council reversed the ALJ on the grounds that he should have found that on November 21, 2013, Holliday "changed age categories to an individual closely approaching advanced age" rather than "an individual approaching advanced age." (Tr. 11.) That decision is not at issue in Holliday's appeal here.

- 3 -

evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted). However, the Court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Id.* (citing *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Nor may the Court "affirm the ALJ's . . . decision based on evidence that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

**II. Analysis**

Holliday argues that: (1) the ALJ's RFC is not supported by substantial evidence; (2) the ALJ erred in determining that Holliday was not fully credible; (3) the ALJ improperly discounted the testimony of Holliday's wife; and (4) the ALJ erred in giving little weight to a Functional Capacity Evaluation.

A. **The RFC Formulation**

Holliday asserts that the ALJ ignored substantial record evidence of impairments in formulating the Holliday's RFC. In part, Holliday cites as error the ALJ's treatment of the testimony of Holliday and his wife; whether the ALJ was correct in finding their testimony less than fully credible will be discussed in subsequent sections. But Holliday also asserts that the ALJ failed to consider the combined effect of Holliday's impairments on his ability to work. Specifically, he alleges that the ALJ failed to consider the effect of Holliday's seizures, TIAs, fatigue and hypertension.

As an initial matter, the ALJ did discuss the effects of these impairments, (Tr. 26–27), and included limitations based on his interpretation of the medical record as a whole. The ALJ recognized that Holliday suffered from "some degree of weakness and fatigue" that limited his ability to lift and carry objects, and additionally "include[d] a restriction as to working in hazardous areas due to the possibility of a seizure." (Tr. 27.) He further recognized "ischemic changes of the brain that would reasonably limit the claimant's ability to perform basic work activities" and accordingly "conclude[d] that the claimant is unable to perform complex tasks, and is therefore limited to work with an svp of 2 or less." (*Id.*)

Moreover, while Holliday asserts that these impairments affected him more severely, the ALJ's interpretation is a reasonable interpretation of the evidence in the record. The ALJ noted that throughout 2010 and 2011, while Holliday suffered from hypertension, his exam findings revealed no disabling symptoms of the hypertension.[5] (Tr. 27, 473, 475, 477, 479, 480, 788, 793, 794, 837, 841.) Nor does Holliday point to any such symptoms. Holliday cites a function report describing his fatigue, (Doc. 20 at 12), but this function report makes no mention of hypertension at all, (Tr. 240–47). Holliday further asserts in his reply brief that "[h]ypertension can cause multiple effects on different areas of the body." (Doc. 22 at 2.) But that general proposition does not mean that Holliday suffered from any such effects.

As for the seizures, TIAs and fatigue, the ALJ reasonably interpreted the medical evidence of record to indicate that Holliday suffered from "some degree of weakness and fatigue" but not to the extent Holliday alleged. He noted a July 2010 consultative exam that was "entirely normal." (Tr. 27, 512–16.) The notes of that examination report that Holliday was "able to shower for himself" and "perform housework and yardwork, just being mindful of his left upper extremity weakness." (Tr. 512.) The ALJ further noted

---

[5] As Holliday points out, (Doc. 22 at 2), one of the records the ALJ cited from 2010 followed upon an emergency room visit in which Holliday's chief complaint was hypertension. (Tr. 475.) The records of that visit indicate that Holliday's symptoms were of "mild severity," and that Holliday initially reported headache and dizziness, but upon examination only reported facial pain. (Tr. 560–65.)

that while Holliday was diagnosed with a seizure disorder and prescribed medication, he never went to the emergency room for seizures or complained of frequent seizures; and while he alleged having several TIAs a month in July 2012, (Tr. 785), there was no support in the records for the disabling symptoms Holliday alleged. (Tr. 27.)

The ALJ thus reasonably interpreted the evidence of the medical records in formulating the RFC. Holliday's assertion that the RFC limitations should have included the limitations to which Holliday and his wife testified will be discussed in the following sections.

### B. Holliday's Credibility

Holliday testified to serious limitations caused by his medical impairments. As summarized by the ALJ:

> The claimant testified that he was unable to work due to back pain and fatigue. The claimant regularly naps during the day. The claimant does very little during the day. He takes his dog for a short walk every day, but he is unable to do more than this. He can microwave meals, but cannot cook more complex meals. He can do some light cleaning, but must takes [sic] frequent breaks while performing such tasks. He has a neighbor check on him to make sure he is doing all right. The claimant has seizures 2–3 times a month. These are "silent seizures" during which the claimant is confused and forgetful. The claimant has memory problems and forgets things. His wife must remind him of appointments and other details of his schedule.

(Tr. 26.) The ALJ found Holliday's testimony "not entirely credible" based largely on its inconsistency with the record as a whole.[6] As discussed above, the ALJ cited to a number of findings throughout the record suggesting that Holliday did not suffer from the degree of daily limitations to which he testified. "Contradiction with the medical record

---

[6] The ALJ wrote, without further elaboration, that "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." (Tr. 28.) It is not entirely clear whether the ALJ meant that daily activities in general are not useful evidence of a claimant's condition, or that in this particular case the record did not bear out Holliday's allegations. The ALJ further noted that even to the extent Holliday's daily activities were "truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons." (Tr. 28.) Holliday does not challenge any of this reasoning on appeal, and the Court does not address it.

is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008).

Holliday, however, argues that the ALJ treated one examination inconsistently and took others out of context. The supposed inconsistent treatment was of the July 2010 examination conducted by Dr. Sarah Shepherd. (Tr. 512–16.) Dr. Shepherd reported that the symptoms caused by Holliday's 2009 stroke had "resolved." (Tr. 512.) She stated that Holliday reported memory loss, but found this not credible as Holliday relayed the details of a trip he had taken which he had earlier claimed to have forgotten. (*Id.*) She also stated that Holliday reported being able to carry out daily activities subject to some left upper extremity weakness, and that he appeared mentally and physically capable at the examination itself. (Tr. 512–15.) She ultimately concluded that Holliday's conditions would not impose any limitations on his ability to work. (Tr. 515.)

The ALJ accepted her observations and her descriptions of Holliday's self-reported limitations, and thus used Dr. Shepherd's findings to discredit Holliday's testimony of more severe limitations. (Tr. 27.) However, the ALJ rejected Dr. Shepherd's ultimate determination that Holliday had no physical limitations, finding that the record suggested at least some degree of ongoing limitation, and therefore gave Dr. Shepherd's opinion on this point "little weight." (Tr. 28.) It is not error for an ALJ to accept a physician's objective medical findings while rejecting that physician's ultimate opinion on a claimant's restrictions.[7] *See Magallanes v. Bowen*, 881 F.2d 747, 754 (9th Cir. 1989).

Holliday also argues that the ALJ took many of the unremarkable medical findings out of context. For example, he notes that two of the clinical examinations came as follow-ups within days of emergency room visits. (Doc. 20 at 15–16.) But while the ALJ did not discuss these emergency room visits, an ALJ "need not discuss *all* evidence

---

[7] Here, of course, the ALJ's parsing of Dr. Shepherd's report actually favored Holliday. This was not the kind of "pick[ing] and choos[ing] evidence unfavorable to the claimant while ignoring evidence favorable to the claimant" against which the Ninth Circuit has cautioned. *See, e.g.*, *Cox v. Colvin*, 639 F. App'x 476, 477 (9th Cir. 2016).

presented"; rather, he must only explain why "significant *probative* evidence has been rejected." *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (citation omitted) (second emphasis added). The records of these emergency room visits are not any more probative as to Holliday's limitations than the records the ALJ did cite.

Holliday presented to the emergency room on February 7, 2010, with a chief complaint of vomiting blood. (Tr. 282.) A nurse's assessment conducted on that day indicated that he was alert, oriented and cooperative; that his mood and behavior were appropriate; and that he cared for himself, walked independently, and performed activities of daily life independently. (Tr. 284.) His discharge diagnosis was one of acute gastritis, brought on by a medication side effect. (Tr. 286.) And while the notes record that his past medical history consisted of congestive heart failure, a heart clamp, CVA, and hypertension, there is no indication that any of those impairments were resulting in symptoms at the time of the ER visit. (Tr. 282.)

Similarly, Holliday presented to the emergency room on February 22, 2010, with a chief complaint of hypertension. (Tr. 394, 560.) Again, Holliday was alert and oriented, with no motor or sensory defects. (Tr. 395, 561.) The psychosocial and safety assessments revealed the following:

> Patient demonstrates normal behavior appropriate for age and situation. The patient has adequate support systems available, is able to ambulate independently, and can perform all activities of daily living without assistance. . . . The patient demonstrates the ability and willingness to learn.
>
> [. . .]
>
> Patient is not at risk for fall as evidenced by: being alert and oriented at presentation, no known physical impairments, normal gait observed . . . .

(Tr. 565.) Thus, the records of Holliday's emergency room visits are consistent with the unremarkable clinical examinations the ALJ did cite, and the ALJ did not err in not addressing the emergency room visits. Likewise, Holliday points to several other physician visits, not addressed by the ALJ, in which Holliday was diagnosed with, and prescribed medication for, his severe impairments, including hypertension and TIAs.

(Doc. 20 at 17–18.) But the issue is not whether Holliday has severe impairments; he does, as the ALJ found at step two. (Tr. 23.) The issue is whether those impairments cause the severe limitations to which Holliday testified, and the ALJ reasonably interpreted the record as indicating that they do not.

The ALJ therefore did not err in finding that Holliday's symptom testimony was not entirely credible.

### C. Mrs. Holliday's Credibility

Shelley Lee Holliday, the claimant's wife, also testified at the hearing. She reported that Holliday had silent seizures, lasting "anywhere from a couple of hours to a full day," once or twice a week. (Tr. 68.) She also testified to Holliday's memory problems, which, she testified, led to several hospitalizations due to Holliday's forgetting to take his medications. (*Id.*)

The ALJ recounted Mrs. Holliday's testimony in his opinion, (Tr. 26), but he gave it little weight:

> Pursuant to SSR 06-03p, the undersigned gives little weight to the testimony of Mrs. Holliday for several reasons. First, Mrs. Holliday is related to the claimant. She is therefore expected to be sympathetic to the claimant and give him the benefit of the doubt. Second, there is no evidence to suggest that Mrs. Holliday has training that qualifies her to determine which of the claimant's apparent limitations are due to his medical impairments as opposed to other factors. Third, as the claimant's wife, Mrs. Holliday has a financial interest in the favorable adjudication of the claimant's application for disability benefits, and therefore has an interest in portraying the claimant's limitations as precluding sustained work activity. Lastly, her observations are not consistent with the record as a whole.

(Tr. 28.)

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Here, the ALJ gave four reasons to discredit Mrs. Holliday's testimony.

First, the ALJ presumed that Mrs. Holliday was "sympathetic" to Holliday and would "give him the benefit of the doubt" because she "is related to" him. But "[t]he fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony." *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996). This is because "testimony from lay witnesses who see the claimant every day is of particular value" and "such lay witnesses will often be family members." *Id.*

Similarly, the ALJ's second proffered reason for discounting Mrs. Holliday's testimony—that Mrs. Holliday lacks the training and qualifications to determine the cause of Holliday's symptoms—could likely "be said of any family member who testified in any case." *Id.* It is therefore not a germane reason to discount Mrs. Holliday's testimony in particular, as opposed to any other non-medical source. *See Perkins v. Colvin*, 45 F. Supp. 3d 1137, 1151 (D. Ariz. 2014) ("The ALJ's disregard of the lay testimony because the witnesses' statements did not include exacting observations as to dates, frequencies, types, and degrees of medical signs or symptoms violates the regulation requiring an ALJ to consider *observations* by non-medical sources."); *see also Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) ("Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence.").

Third, the ALJ discredited Mrs. Holliday's testimony because, as Holliday's wife, she had a financial interest in the outcome of Holliday's benefits application. "Bias and financial motive may serve as legitimate reasons to discredit the testimony of a third party when those reasons are supported by substantial evidence." *Perkins*, 45 F. Supp. 3d at 1152 (citing *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006)). But here, the ALJ cited no evidence of any financial motive besides Mrs. Holliday's relationship with the claimant. He did not, for example, cite any evidence that Mrs. Holliday paid the couple's bills, or that the couple had exhausted their savings or credit lines. *Cf. Perkins*, 45 F. Supp. 3d at 1152. To presume financial bias simply on the basis of a spousal relationship is not a reason germane to Mrs. Holliday specifically. *See Valentine v.*

*Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) ("[I]nsofar as the ALJ relied on characteristics common to all spouses, she ran afoul of our precedents.").

However, the ALJ's final reason—that Mrs. Holliday's testimony was not consistent with the record as a whole—is valid. *See Lewis*, 236 F.3d at 511 ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."). Mrs. Holliday testified that she saw Holliday suffer from "silent seizures" "frequently," in which he would get confused and not know where he was and what people were saying. (Tr. 67–68.) She also testified that Holliday suffered from memory problems, such that he would forget to take his medication. (Tr. 68.) But as discussed above, the record as a whole does not support allegations of limitations to this extent.[8] This inconsistency was a germane reason for the ALJ to discount Mrs. Holliday's testimony.

The ALJ thus cited one permissible reason, and three impermissible reasons, in giving little weight to Mrs. Holliday's testimony. As the inconsistency with the record is legally sufficient to discredit Mrs. Holliday's testimony, the ALJ's error in discrediting Mrs. Holliday on the basis of her relationship to the claimant and her lack of medical expertise was harmless. *See Carmickle*, 533 F.3d at 1162 ("[T]he relevant inquiry . . . is whether the ALJ's decision remains legally valid, despite such error.").

### D. The Functional Capacity Evaluation

Holliday undertook a "Functional Capacity Evaluation" ("FCE") on October 21, 2014, (Tr. 851–75), two weeks prior to his hearing with the ALJ. According to the FCE report,

> Mr. Holliday was referred to this facility to answer the following questions about his current work/functional ability:

---

[8] Holliday argues that the ALJ's simple statement that Mrs. Holliday's "observations are not consistent with the record as a whole" is insufficiently detailed as to allow for meaningful review. (Doc. 20 at 19–20.) The ALJ could have provided more details in his discussion of Mrs. Holliday's testimony, but he was not required to do so as a matter of law. The ALJ had already discussed the sections of the record that contradicted Holliday's assertions of disabling limitations and did not need to do so a second time. *See Lewis*, 236 F.3d 512 (affirming ALJ who did not specifically link lay witness testimony to inconsistent portions of record but "did note some arguably contradictory testimony at other points in his decision").

> 1. Did Mr. Holliday provide high levels of physical effort through-out the testing day?
>
> 2. Are Mr. Holliday's reports of pain and disability reliable?
>
> 3. What is Mr. Holliday's current maximum safe lifting capacity?
>
> 4. To which physical demand level for work is Mr. Holliday currently limited?
>
> 5. Determine recommendations for work restrictions or rehabilitation.

(Tr. 851.) The report concluded that Holliday gave high levels of physical effort in completing the test and that his reports of pain and disability were reliable. (Tr. 853.) It recommended certain physical restrictions with respect to work and found that Holliday had the ability to perform sedentary work, with extra restrictions. (*Id.*) The FCE report, however, did not purport to determine whether Holliday had any "memory and/or cognitive issues that could affect employability." (*Id.*)

The ALJ gave the FCE "little weight." (Tr. 28.) He cited four reasons for doing so:

> [T]his FCE was performed many years after the claimant's alleged onset date and therefore does not necessarily reflect the claimant's functional status during the entire period at issue. The FCE is also based in part on the claimant's effort and subjective complaints. The claimant's treatment history and the exam findings of his treating providers and the [consultative examiner] are not consistent with [the FCE examiner's] conclusions. The opinion is also poorly explained.

(*Id.*) The parties agree that the ALJ correctly categorized the FCE examiner as an "other source," rather than an "acceptable medical source," pursuant to the regulations in force as of the decision. (*Id.*; Doc. 20 at 20; Doc. 21 at 9–10.) As with a lay witness, an ALJ "may discount testimony from these other sources if the ALJ gives reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (internal quotation marks omitted).

As with the testimony of the lay witness, the ALJ provided both permissible and

impermissible reasons for giving the FCE little weight. First, despite the late date, the FCE took place during a period still relevant to Holliday's supplemental security income claim.[9] Simply because it could not provide a longitudinal picture of Holliday's condition throughout the entire relevant period does not mean that it was not a relevant data point within that period.

Likewise, the ALJ described the FCE as being "poorly explained," but he failed to explain that point. As the ALJ did not discuss the FCE elsewhere in his opinion, the Court is unable to conclude that this was a germane reason to give the FCE little weight.

Further, simply because the FCE relied in part on Holliday's effort and subjective complaints does not, without more, make it unreliable. An ALJ may give little weight to a physical function examination based on a claimant's failure to give maximum effort during the exam. *See, e.g.*, *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). Here, however, the examiner noted that "[o]verall test findings, in combination with clinical observation," indicated that Holliday gave high efforts and provided reliable reports of pain and disability. (Tr. 851.) The FCE appears to have controlled specifically for the possibility of inadequate effort. (Tr. 858–70.) The possibility that some claimants could give inadequate effort during an examination is not a germane reason to infer that Holliday did so in this examination.

However, as discussed above, contradiction with the medical record is a permissible reason to give little weight to an "other source." *See Lewis*, 236 F.3d at 511. In October 2014, the same month Holliday completed the FCE, he was hospitalized for back pain. The records of that hospitalization indicate that on October 14, Holliday had a "normal neuro exam [with] normal reflexes"; was "able to lift his legs without any difficulty"; and had a "[s]light decrease in range of motion due to pain" but "no weakness in his extremities." (Tr. 991–92.) On October 19, he had a "normal range of motion" although he experienced some difficulty walking. (Tr. 1032–33.) It was not

---

[9] The relevant period for disability benefits ended at Holliday's date last insured of December 31, 2012; but the relevant period for supplemental security income was still ongoing as of the FCE.

- 13 -

unreasonable for the ALJ to interpret the FCE examiner's determination that Holliday was limited to sedentary work as being inconsistent with this medical evidence of record.

As with the other non-medical testimony the ALJ disregarded, the ALJ's error in giving the FCE little weight on the basis of several impermissible reasons was harmless in light of the FCE's inconsistency with the medical records.[10] *See Carmickle*, 533 F.3d at 1162.

## CONCLUSION

The ALJ did not commit reversible error in denying Holliday's application for benefits, and the decision is affirmed.

**IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED**. The Clerk of Court is directed to terminate this case and enter judgment accordingly.

Dated this 7th day of July, 2017.

Honorable G. Murray Snow
United States District Judge

---

[10] The ALJ did not expressly indicate which part of the record he found to contradict the FCE report, but that omission is not reversible error, as he did discuss the October hospitalizations elsewhere in the opinion, (Tr. 26–27). *See Lewis*, 236 F.3d 512 ("While the ALJ, in dismissing [lay witness] testimony, did not specify any inconsistent 'prior recorded statements,' he did note some arguably contradictory testimony at other points in his decision.").

- 14 -